**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

ARBOLEDA A. ORTIZ,                        )
                                          )
                    Plaintiff,            )
        vs.                               )        2:05-cv-246-LJM-JMS
                                          )
DR. THOMAS WEBSTER,                       )
                                          )
                    Defendant.            )

**Entry Discussing Motion for Summary Judgment**

For the reasons explained in this Entry, the defendant's renewed motion for summary judgment must be **granted**.

**I. Background**

"[I]n certain limited circumstances the Constitution imposes upon the [government] affirmative duties of care and protection with respect to particular individuals."[1] "The affirmative duty to protect arises not from the [government's] knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."[2] Arboleda Ortiz, who is confined at a federal prison within this District because of his crimes, is among those for whom the government must supply constitutionally adequate medical care. He has sought to vindicate what he argues to have been the deprivation of that right through this action brought pursuant to the theory recognized in *Bivens v. Six Unknown Named Agents*.[3]

As a result of prior proceedings in the case, claims against prison Warden Mark Bezy and prison Health Services Administrator Sharon Seanez have been resolved. The claim against the prison's Clinical Director, Dr. Thomas Webster, was remanded for further

---

[1] *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 198 (1989).

[2] *Id.* at 200.

[3] 403 U.S. 388 (1971).

development in *Ortiz v. Bezy*.[4] The Seventh Circuit found that Ortiz had shown a genuine issue of material fact regarding whether Dr. Webster was deliberately indifferent to Ortiz's medical needs.

Following the remand, Dr. Webster filed a renewed motion for summary judgment, counsel was recruited to represent Ortiz, and the motion has been thoroughly briefed.[5]

## II.  Summary Judgment Standard

"The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims."[6] "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."[7] Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[8] A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party.[9] "The applicable substantive law will dictate which facts are material."[10]

"When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."[11] The nonmoving party

---

[4]281 Fed. Appx. 594, 2008 WL 2415857 (7th Cir. 2008) (unpublished Order).

[5]Attorneys Marisol Sanchez and Vilda Samuel Laurin now represent Ortiz. They have ably represented Ortiz in every respect and the court is grateful for their efforts.

[6]*Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

[7]*Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted).

[8]FED.R.CIV.P. Rule 56(c).

[9]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[10]*National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996)(citing *Anderson,* 477 U.S. at 248).

[11]FED. R. CIV. P. 56(e)(2).

bears the burden of demonstrating that such a genuine issue of material fact exists.[12] When the moving party has met the standard of Rule 56, summary judgment is mandatory.[13]

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute."[14] "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."[15]

In addition to the foregoing, a court "may consider only admissible evidence in assessing a motion for summary judgment."[16] Materials which do not comply with the standard of Rule 56(e) will be disregarded.[17] "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion."[18]

### III.  Material Facts

The following statement of undisputed material facts is evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Ortiz as the non-moving

---

[12]*See Harney,* 526 F.3d at 1104 (citing cases).

[13]*See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

[14]*Harney,* 526 F.3d at 1104 (internal citations omitted).

[15]*Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

[16]*Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009)(citing cases).

[17]*Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003)("[A] party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission and deeming the opposing party's proposed findings of fact admitted and then determining whether those facts entitle the moving party to judgment as a matter of law.").

[18]*Paniaguas v. Aldon Cos.,* 2006 WL 2568210, at *4 (N.D.Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.,* 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir. 1989)).

party with respect to the motion for summary judgment.[19] This statement of undisputed material facts, moreover, is drawn from the materials which are properly presented and which comply with the evidentiary standard of Rule 56(e) of the *Federal Rules of Civil Procedure.*

! Ortiz has been confined at the Federal Correctional Complex, Terre Haute (FCC) since January 19, 2001. The FCC is a prison complex operated by the Federal Bureau of Prisons (BOP). Ortiz has been sentenced to death and at all relevant times has been confined in the Special Confinement Unit (SCU) at the FCC.

! Ortiz testified in his declaration that from the time of his arrival at the FCC through August of 2008, he had pain in his eyes and that his eyes were red, bloodshot, itchy, swollen, and at times were infected, producing a clear or milky white discharge. The pain was from minor to intense and excruciating at times. His eyes felt as if someone was rubbing a piece of sand paper across them. Ortiz's vision was distorted and blurry, as if he was looking through a dull, out-of-focus lens, which caused him to have excruciating headaches behind his eyes.

! Ortiz's eye condition was visible to others. Other inmates in the SCU testified that Ortiz's eyes were red, itchy, swollen, oozing, and glazed over.

! Ortiz had pterygium in both eyes. Pterygium consists of abnormal triangular masses of thickened conjunctiva that extend over the cornea.[20]

! Ortiz's history of pterygia can be first traced back to April 30, 2001, when he was evaluated by ophthalmologist Dr. Jonathan McGlothan. In his report, Dr. McGlothan found that Ortiz's visual acuity was 20/80 in each eye and that he suffered from pterygia. Dr. McGlothan also noted that Ortiz's visual acuity was 20/50 with corrected vision, meaning with glasses. While prescribing eyeglasses for Ortiz,[21] Dr. McGlothan nonetheless further noted that the pterygium "OU" (in both eyes), was "visually significant" and that Ortiz had astigmatism in both eyes.[22] Accordingly, Dr. McGlothan recommended surgery.

! The recommendation was submitted for approval on April 30, 2001. Dr. David

---

[19] *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

[20] *Ortiz v. Bezy*, 2008 WL 2415857,*1 (7th Cir. 2008) (unpublished Order).

[21] The eyeglass prescription issued by Dr. McGlothan was processed on June 1, 2001 and issued on June 26, 2001.

[22] "The term 'visually significant' is a term of art that signifies both a significant change in vision as well as determines when surgical intervention is necessary." See Maturi Dec. ¶2, Attachment B thereto at 2.

George, D.O., a Staff Physician at the FCC signed off on Dr. McGlothan's treatment plan. That same day, April 30, 2001, Dr. Gregory Lawson, who was the Clinical Director at FCC at that time, approved the recommended treatment (*i.e.,* excision of pterygium in both eyes). The Utilization Review Committee ("URC"), however, rejected the request and deferred the same. Debi Lamping, a Health Systems Specialist at the FCC added a "NO TOWN TRIP" notation on the medical consultation sheet immediately after the URC considered and deferred the April 30, 2001, recommendation for surgical excision.[23]

! On July 23, 2001, Ortiz visited the Chronic Care Clinic, where it was noted that Ortiz's eyes "show [bilateral] pterygium." Dr. McGlothan's request for excision of the pterygium was denied again on October 10, 2001, but this time the denial came from the Central Office.[24]

! On February 11, 2002, Dr. Chris Radaneata, O.D., a contract optometrist for the FCC, also diagnosed Ortiz with bilateral pterygium, but did not recommend surgery at that time. Dr. Radaneata determined that the pterygium did not interfere with Ortiz's vision. Instead, Dr. Radaneata prescribed artificial tears with no refills. Expert witness Dr. Maturi opines that at that time, drops of artificial tears and prednisolone was the proper treatment for pterygia.

! Dr. Webster commenced his employment as clinical director at the FCC Terre Haute on June 2, 2002.

! On November 7, 2002, Ortiz again visited the clinic regarding the bilateral pterygium condition and demanded to see an eye doctor for removal of the pterygium. No indication was noted as to the treatment provided at that time.

! On December 13, 2002, Ortiz visited the clinic regarding the bilateral pterygium,

---

[23] For clarity, there are two medical records that contain the "NO TOWN TRIP" notation: the April 30, 2001, consultation sheet in which Dr. McGlothan initially recommends surgery for removal of Ortiz's pterygia and which contains further notation dated October 2001: "Surgical request denied by Central Office at this time" [Pl's Ex. 8, dkt 142-8]; and the same April 30, 2001, consultation sheet which contains a different further report, dated February 11, 2002, by Dr. Radaneata, recommending artificial tears as treatment for the bilateral pterygium. [Pl.'s Ex. 10, dkt 142-10]. The April 30, 2001, consultation sheet is thus duplicated in Ortiz's medical records, with differing additional material noted on it. At the very top of that sheet is the notation "NO TOWN TRIP." This notation was *made on one sheet* immediately after the URC considered and deferred a request for outside treatment for Ortiz. There were not two separate identical notations regarding "no town trip."

[24] There was a period of time during which the FCC was without doctors, and Ortiz's requested care had been deferred.  It is for that reason that in October 2001, Dr. McGlothan's April 30, 2001, recommendation was submitted to the Central Office of the BOP for action.

where he was again prescribed artificial tears with an additional two refills. During this visit, Ortiz complained that his eyes were irritated. Ortiz's bilateral pterygium was noted as "red irritated conjunctiva dry."

! On April 24, 2003, surgery was once again recommended. Pam Swain, PA-C, RN, referred Ortiz to another ophthalmologist, Dr. Conner, to have Ortiz's eyes evaluated again for the bilateral pterygium. In her referral to Dr. Conner, Ms. Swain noted Ortiz's visual acuity to be 20/100 and further noted Ortiz has having "difficulty seeing up close and at a distance in both eyes." (Ortiz's Ex. 16). In his May 14, 2003 medical report, Dr. Connor noted the pterygium in both eyes was "causing corneal distortion," and thus referred Ortiz to Dr. McGlothan for removal of the pterygium. (Ortiz's Ex. 16, 17). The request for removal of the pterygium was deferred.

! On May 21, 2003, Dr. McGlothan submitted another request for surgical excision of the pterygium. That same day the URC met and denied Dr. McGlothan's request for eye surgery. The URC noted a "follow up" with Dr. Webster, the Clinical Director.

! On May 22, 2003, Dr. Webster noted Ortiz as having 20/100 vision in each eye and further noted that he may need pterygium surgery in the next two years. Additionally, the note stated a follow-up with the eye clinic will take place, but no record of a follow-up exists.

! A year later, on April 13, 2004, Ortiz, again complaining about his eyes being irritated and itching, was examined by another physician who prescribed more artificial eye drops for the bilateral pterygium.

! There was a consultation for Ortiz on June 29, 2004, with Dr. Radaneata, for his complaints concerning the pterygium. The plan after this visit was no surgical intervention at that time. Artificial tears were prescribed and he was to be followed up in 6 months.

! Ortiz visited the clinic again on July 29, 2004, August 02, 2004, and October 29, 2004, regarding his eyes and was prescribed eye drops during each visit. (Ex. 26, 27, 28). During the July 29, 2004 visit, it was noted that the pterygia was encroaching on the cornea for 2 mm on the left eye (Ocular Sinister) and 3 mm on the right eye (Ocular Dexter). (Ex. 26). During the August 2, 2004 visit, it was also noted "fibrosis tissue encroaching from the visual area to the iris area, associated with constant redness." (Ex. 27).

! Ortiz was referred to Dr. Rutan, an optometrist. On July 19, 2006, Dr. Rutan examined Ortiz and recommended that he be considered for resection. Dr. Rutan also noted the pterygia was encroaching on the cornea for 2 mm on one eye and 3 mm on the other eye, as had been noted during Ortiz's medical examination on July 29, 2004.

6

- On August 22, 2006, Ortiz made an outside visit to a doctor in Terre Haute, Indiana, where it was noted that "pt needs to have surg. to remove the pterygia." During that visit, it was noted that both Ortiz's eyes were "itchy, red, and painful".

- On September 27, 2006, the URC met and approved surgery for Ortiz for the removal of the pterygiums.

- On November 1, 2006, Ortiz underwent the first operation for removal of the pterygium in his left eye. The surgery was performed at Terre Haute Regional Hospital.

- On June 19, 2007, he had surgery on his other eye. This surgery was also performed outside of the FCC.

- Between January 2001 and December 2005, no death row inmates housed on the SCU were taken outside of the institution for outside or off-site medical evaluation, examination or treatment.

- Debi Lamping was a Health Systems Specialist at the FCC from May 1999, through August 2005. Her duties and responsibilities included coordination of outside health care visits for inmates. Lamping testified that pursuant to the practice of Dr. Gregory Lawson, the Clinical Director at FCC Terre Haute in 2001, she would make a notation in a patient's chart as to whether a recommendation for outside treatment, *i.e.,* a "town trip" had been approved or disapproved (or deferred) by the URC immediately after the URC action. If the URC disapproved or deferred the request, Lamping would make a "no town trip" or similar notation. Other than Dr. Lawson's practice to use that phrase to annotate the patient's record when the URC denied or deferred a request for outside treatment, there was no "no town trip" policy, regulation, directive, instruction, notice, practice or custom that references, governs, applies directly or indirectly to the "no town trip" notation. There was no policy, regulation, directive, instruction, notice, practice or custom, that would have prevented inmates from receiving any appropriate care outside the institution, if such care were warranted and properly approved.

- Dr. Webster testified that the inmates confined in the SCU who are sentenced to death are all classified as either Care Level 1, which is defined as heathy or simple chronic care, or Care Level 2, which is defined as stable, chronic care. Given these classifications, there is no need for outside medical trips for such inmates unless an issue may occur which is considered medically necessary.

## IV.  Discussion

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to

7

victims if such deterrence fails."[25] *Bivens* "authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers . . . ."[26] The court has jurisdiction over such claims through 28 U.S.C. § 1331. A prerequisite to maintaining an action under § 1331 is that the plaintiff "must allege a violation of the United States Constitution or a federal statute."[27] "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred."[28] "[T]he first step in any [§ 1983] claim is to identify the specific constitutional right infringed."[29] Because *Bivens* creates a remedy, not a substantive right,[30] this same inquiry governs claims asserted pursuant to *Bivens.*

The constitutional provision pertinent to Ortiz's claim is the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.[31] Specifically, pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of the inmates.[32] To prevail on an Eighth Amendment claim based on inadequate conditions, the prisoner must show that (1) the conditions in the prison were objectively "sufficiently serious so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," and (2) prison officials acted with deliberate indifference to those conditions.[33] In order for an inmate to state a claim under a *Bivens* theory for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to

[25] *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).

[26] *King v. Federal Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005).

[27] *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir. 1987).

[28] *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

[29] *Albright v. Oliver,* 510 U.S. 266, 271 (1994); *see also Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005)("[C]onstitutional claims must be addressed under the most applicable provision.").

[30] *Abella v. Rubino,* 63 F.3d 1063, 1065 (11th Cir. 1995) (noting that "the effect of *Bivens* was to create a remedy against federal officers acting under color of federal law that was analogous to the Section 1983 action against state officials").

[31] *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

[32] *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997).

[33] *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (internal citations and quotation marks omitted).

evidence deliberate indifference to serious medical needs."[34] "A claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition, and 2) an official's deliberate indifference to that condition."[35] Although there is no precise test to assess when a plaintiff's medical need is sufficiently serious, the pertinent standard contemplates a condition that has been diagnosed by a doctor as requiring treatment or one that is so obvious that even a lay person would perceive the need for medical treatment.[36] Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[37]

In this case, Ortiz's pterygia certainly reached the stage of a serious medical need. Dr. Webster disputes this not in the abstract, but combines this requirement with the appropriateness of a particular treatment modality: "Ortiz cannot establish that the pterygium[sic] were sufficiently serious that surgery, rather than the symptomatic treatment provided, was required."[38] Precedent does not conflate the serious medical need requirement of a viable Eighth Amendment claim with a particular treatment or medical response; instead, the objective requirement focuses solely on the existence or absence of an objectively serious medical *condition.*

Resolution of Dr. Webster's motion for summary judgment hinges, instead, as do so many others, on the existence of a genuine issue for trial as to whether he acted or failed to act with a "sufficiently culpable state of mind."[39] For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the

---

[34] *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

[35] *Williams v. Liefer,* 491 F.3d 710, 714 (7th Cir. 2007) (citations omitted).

[36] *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005); *Gutierrez v. Peters,* 111 F.3d 1364,1373 (7th Cir. 1997).

[37] *Farmer,* 511 U.S. at 837 (construing *Estelle*).

[38] Def. Brief at 8.

[39] *Greeno,* 414 F.3d at 653.To establish deliberate indifference, Ortiz must show more than mere negligence or even gross negligence. *See Farmer,* 511 U.S. at 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Lee v. Young,* 533 F.3d 505, 509 (7th Cir. 2008) ("With respect to the culpable state of mind [for a deliberate indifference claim], negligence or even gross negligence is not enough . . . .").

decision on such a judgment.'"[40]

Thus, at the time Dr. Webster assumed his position as Clinical Director of the FFC in June 2002, Ortiz had been examined by an opthamologist, his condition had been diagnosed as pterygia, the ophthamologist's recommendation for surgical excision had been denied by the URC, the recommended surgery had been denied by the BOP Central Office several months later, and Ortiz had been examined by an optometrist, who prescribed artificial tears and prednisolone. This most recent examination and treatment of Ortiz's pterygia, insofar as documented in his medical records, had occurred approximately four months before Dr. Webster assumed his position.[41]

At what was then the most recent examination by an outside consultant, moreover, the course of treatment was not surgical excision of the pterygia. The treatment recommended and provided by Dr. Radaneata in February 2002 was thought at the time to be the proper treatment for pterygia.

This treatment remained in place for Ortiz for some time, through December 13, 2002, through April 13, 2004, through June 29, 2004, and through July, August and October 2004.[42] Throughout this time there were also recommendations for surgery–particularly in April-May 2003. Of particular importance here is the record of Dr. Webster's examination of Ortiz on May 22, 2003. On that occasion, Dr. Webster noted Ortiz as having 20/100 vision in each eye and further noted that he may need pterygium surgery in the next two years. This notation shows Dr. Webster's awareness of Ortiz's condition, of the treatment which was ongoing, of the progressive nature of the condition, *and of the surgical option.* Despite the surgical recommendations both before and after the May 22, 2003, evaluation by Dr. Webster, Ortiz's pterygia continued to be treated in a non-surgical manner. As already noted, as late as October 2004, Ortiz was treated in this fashion by an outside consultant. Throughout this period of time, therefore, Dr. Webster certainly based

---

[40]*Sain v. Wood,* 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)); *see also Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Deliberate indifference requires a showing that the official was actually aware of a serious risk yet failed to take any action. *See Whiting v. Marathon County Sheriff's Dep't,* 382 F.3d 700, 703 (7th Cir. 2004); *Jackson v. Ill. Medi-Car, Inc.,* 300 F.3d 760, 765 (7th Cir. 2002).

[41]Dr. Webster cannot be held liable for decisions made prior to his own participation in the decisions to provide, to modify, or to deny medical treatment for Ortiz. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1948 (2009)("Because vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution). In this case, that means at least decisions made prior to June 2002.

[42]These are all occasions when treatment of Ortiz's pterygia is noted in his medical records.

his treatment decisions on professional judgment. This, in turn, negates the element of deliberate indifference.[43]

Proceeding to events occurring after Ortiz filed this lawsuit, but relevant to the overall medical care he received,[44] on July 19, 2006, Dr. Rutan examined Ortiz and recommended that he be considered for resection. Dr. Rutan also noted at that time the pterygia was encroaching on the cornea for 2 mm on one eye and 3 mm on the other eye. This was followed by another outside visit to a specialist in August 2006, followed by the URC's approval on September 27, 2006, of surgery for Ortiz for the removal of the pterygia, and followed in turn by the first pterygium removal surgery on November 1, 2006. The second such surgery was then performed on June 19, 2007.

What Ortiz has shown is, at best, disagreement with medical professionals about his treatment needs. Such a disagreement with the exercise of medical judgment does not state a claim for deliberate indifference.[45] He has not shown any policy by the medical staff at the FCC to deny SCU inmates such as himself access to specialized off-site medical consultation and care when medically necessary–and the cryptic notation seemingly supporting his theory of such a policy is actually nothing other than an equally cryptic means by which Dr. Webster's predecessor would annotate the URC's decision on a recommendation for off-site care.[46] He has likewise not produced medical evidence "'to establish the detrimental effect of delay in medical treatment'" insofar as argued to establish or buttress a showing of deliberate indifference.[47]

---

[43]"'[D]eliberate indifference may be inferred . . . when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996)).

[44]A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999).

[45]*Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003); *see also Edwards v. Snyder,* 478 F.3d 827, 831 (7th Cir. 2007)(medical malpractice or a disagreement with a doctor's medical judgment does not constitute deliberate indifference.); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.").

[46]Ortiz's theory of such a policy is based on his speculation and that of other SCU inmates.  This is not sufficient to create a genuine question of fact. *See Liu v. T & H Machine, Inc.,* 191 F.3d 790, 796 (7th Cir. 1999) (a party must present more than mere speculation or conjecture to defeat a summary judgment motion).

[47]*Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir. 1996)(quoting *Byerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir. 1995)). Such a showing is required in order to demonstrate that

## V.  Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial."[48] This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.[49]

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates."[50] However, the evidentiary record in this case negates the presence of an essential element as to the claim asserted by Ortiz, and judgment as a matter of law is appropriate when a party fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.[51] That is the case here. The pleadings and the evidentiary record support only the conclusion that Dr. Webster was not deliberately indifferent to Ortiz's serious medical needs. Dr. Webster is therefore entitled to the entry of summary judgment. The motion for summary judgment (dkt 89) is **granted**. Judgment consistent with this Entry shall now be entered.

**IT IS SO ORDERED.**

Date:   03/30/2010

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

---

there was unconstitutional delay in the treatment of a serious medical condition. *Id.*

[48]*Crawford-El v. Britton,* 523 U.S. 574, 600 (1998).

[49]*Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

[50]*Turner v. Safley,* 482 U.S. 78, 84 (1987).

[51]*Lewis v. Holsum of Ft. Wayne, Inc.,* 278 F.3d 706, 709 (7th Cir. 2002) (on summary judgment, "a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).